UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                 **Plaintiffs,**<br><br>    -against-<br><br><br>BINGO SUPPLIES INC., ELEOR GULKAROV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                 **Defendants.** | CIVIL ACTION<br><br>24-CV-1825<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Bingo Supplies Inc. ("Bingo"), Eleor Gulkarov ("Gulkarov") (Bingo and Gulkarov are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.     From at least August 2021 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.     This action seeks to recover more than $86,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for rental pain management durable medical equipment ("DME") devices, in particular Squid Cold Compression Systems (hereinafter "Cold Compression Devices") and Pain Shield MD portable ultrasound ("Portable Ultrasound") units (collectively "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their

homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools and compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every piece of Rental DME supplied by Bingo was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, Defendant Gulkarov, through Bingo, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

    (a) utilizing blank template prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME; and/or

    (b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME; and/or

(iii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.      The use of generic and/or formulaic descriptions in the fraudulent template prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, Bingo routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      In many instances, Gulkarov submitted to Plaintiffs, through Bingo, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to

misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics Gulkarov, through Bingo, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $86,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

12.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in

the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.     Defendant Bingo is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Bingo accepted (and continues to accept) assignments of benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Bingo submitted (and continues to submit) its claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Bingo contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, Bingo identified the Rental DME it purportedly provided to Covered Persons on the claim forms using Healthcare Common Procedure

Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

19.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible

reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

24.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter

the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

27.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

28.     At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

30.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

31.     At all relevant times mentioned herein prior to April 4, 2022, For DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

32.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021)

(http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496

(Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

33.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022,

the WCB established its own fee schedule for DME and orthotic devices to replace its prior

adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical

supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME

Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee

Schedule are collectively referred to as the "Fee Schedule").

34.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule lists DME

and orthotic devices by their corresponding HCPCS Level II Codes.

35.     With respect to rental DME, at all relevant times mentioned herein on or after April

4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited as follows:

> The maximum permissible monthly charge for the rental of durable medical
> equipment shall be the rental price listed in the Official New York Workers'
> Compensation Durable Medical Equipment Fee Schedule multiplied by the
> total number of months or weeks respectively for which the durable medical
> equipment is needed. In the event the total rental charge exceeds the
> purchase price, the maximum permissible charge for the durable medical
> equipment shall be the purchase price listed in the Official New York
> Workers' Compensation Durable Medical Equipment Fee Schedule,
> whether or not the claimant keeps the durable medical equipment or returns
> it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

36.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation

83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME

Fee Schedule.

37.     Pursuant to Regulation 83, the requirements of prior authorization under the WCB DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

38.     The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule in its amendment of 12 N.Y.C.R.R. § 442.2 creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

39.     To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

40.     By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

41.     DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of:

    (1)     acquisition cost plus 50%; or

(2)     usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

(2)     The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)     acquisition cost plus 50%;

(ii)    usual and customary price charged by durable medical equipment providers to the general public; or

(iii)   purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

42.     At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R, § App.17-C Part E.

43.     At all relevant times mentioned herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30,

2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

44.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

45.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

46.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Gulkarov, through Bingo, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME and accompanying accessories provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME and accompanying accessories.  To the extent the Rental DME and accompanying accessories were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

47.     On information and belief, in furtherance of the scheme to defraud alleged herein, Bingo as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

48.     As part of a fraudulent protocol of treatment, in addition to receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical

pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces from other DME retailers, Bingo delivered to the Covered Persons expensive rental pain management DME and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In most cases, the Covered Persons receive from Bingo, both a Compression Device and a Portable Ultrasound unit, medically unnecessary items, for up to 28 days or longer, averaging upwards of $7,000.00 in a total cost for the items, as part of the scheme to financially enrich Bingo, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

49.     On information and belief, Bingo was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

50.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

51.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity.  Every

facet of Defendants' operations, from securing fraudulent prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

52.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Bingo's No-fault claims because Gulkarov, through Bingo, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME and accompanying accessories to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME and accompanying accessories that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.  Such claims continue to be submitted by and/or in the name of Bingo and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

53.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample in excess of $494,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## **NATURE OF THE ACTION**

54.     This action is brought pursuant to:

i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)    New York State common law; and

iii)   the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## **NATURE OF RELIEF SOUGHT**

55.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME and accompanying accessories they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

56.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Bingo's unpaid No-fault claims because:

i)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and accompanying accessories that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

57.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $86,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for Rental DME and accompanying accessories that were never provided or, if provided, not provided as billed and/or provided

pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

<div align="center">**THE PARTIES**</div>

**A.      Plaintiffs**

58.      Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.      Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.      Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.      Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

63.      Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.**     **The Individual Defendant**

64.     Eleor Gulkarov ("Gulkarov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Defendant Bingo, and, at all times relevant herein, operated, managed, and/or controlled their activities.

**C.**     **The Retailer Defendant**

65.     Bingo Supplies Inc. ("Bingo") was formed on or about August 6, 2021, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 178-27 Hillside Avenue, Jamaica, New York 11432. Bingo is operated, managed, and/or controlled by Defendant Gulkarov and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME and accompanying accessories under the No-fault Law.

**D.**     **The John Doe Defendants**

66.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**     **The ABC Corporations**

67.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

68.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

69.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

70.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

71.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

72.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

73.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

74.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

75.     Bingo is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Bingo accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

76.     To process and verify the claims submitted by Bingo, Plaintiffs required, and Bingo submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Bingo was seeking reimbursement from Plaintiffs.

77.     In nearly all instances, the prescriptions submitted in support of Bingo's claims for reimbursement were fraudulent, fabricated, duplicated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

78.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Bingo made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME and accompanying accessories did not exceed that permissible under the No-fault law and regulations.

79.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Bingo's claims within 30 days of receipt of proof of claim.

80.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Bingo in support of its claims, and paid Bingo based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

81.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

82.     At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

83.     At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

84.     At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental

charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

85.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

86.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

87.     At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

88.     On April 4, 2022, the WCB's amendments to 12 N.Y.C.R.R. § 442.2 took effect, including the establishment of the WCB DME Fee Schedule.  As part of the WCB's establishment

of the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

89.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

90.     At all times mentioned herein on or after April 4, 2022, for WCB DME Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

91.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68

(Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

92.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: [t]he maximum permissible purchase charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public. 11 N.Y.C.R.R. § App.17-C Part E(c) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E(c), (d)(2). (Final Adoption effective February 15, 2023).  Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

93.     Bingo was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME and accompanying accessories that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided

pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

94.     The Rental DME that Bingo purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Gulkarov, through Bingo, created a billing apparatus which implemented a portion of a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

95.     Gulkarov created and controlled Bingo, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME, DME, and/or orthotic devices.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Gulkarov, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, misrepresented the nature, quality, and cost of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, submitted bills to Plaintiffs for Rental DME that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, submitted prescriptions and bills to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, submitted prescriptions to Plaintiffs for Rental DME that were no more than pre-printed template forms containing boilerplate language to conceal the lack of medical necessity for the items;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Gulkarov, through Bingo, entered into illicit relationships with the No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided Bingo with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

96.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded several thousands of dollars per Covered Person.

97.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Gulkarov engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Bingo, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

26

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or
- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

98.    At all relevant times mentioned herein, Gulkarov knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME and accompanying accessories.

99.    At all relevant times mentioned herein, Gulkarov, through Bingo, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

100.    At all relevant times mentioned herein, Gulkarov and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

101.    Beginning in August 2021, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Cold Compression Devices and Portable Ultrasound units to Covered Persons.

102.    Gulkarov formed, owned and/or controlled Bingo for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

103.    Bingo, through Gulkarov, engaged in a pervasive scheme to defraud, wherein Gulkarov: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME and accompanying accessories that were purportedly provided to Covered Persons based on medical necessity when, in fact, Gulkarov, through Bingo, determined the Rental DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar Rental DME for a substantially similar timeframe.

104.    Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

105.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME

and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for DME.

106.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

107.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Bingo by: (i) causing their HCPs to write Rental DME prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying Rental DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms. By way of example and not limitation, Exhibit "3" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted by the Retail Defendants wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

108.     Moreover, in keeping with the fact that the Rental DME was not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the HCPs were issued on template, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device.  There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. The prescription forms contained in Exhibit "4" are also a representative sample of prescriptions with the identical, boilerplate language.

109.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Bingo to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME.

110.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

111.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, Bingo routinely deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

112.     As a matter of pattern, practice, and protocol, Bingo routinely provided Covered Persons with expensive Cold Compression Devices and/or Portable Ultrasound units that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

113.      In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where ethe Covered Persons were treated.  To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified

Rental DME that was not included on the prescriptions issued by the HCPs.  On many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were issued on dates that the Covered Persons did not treat with the HCPs. In addition, on many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were left undated, obscuring when the prescription was issued and when legitimately prescribed DME would have been noted in the prescribing HCP's treatment notes.  By way of example and not limitation:

- On October 12, 2021 Covered Person G.P., claim no. 0643327497-02 was purportedly seen by the HCP, for an initial chiropractic examination at a No-fault Clinic located at 71 South Central Avenue, Valley Stream, NY, and thereafter, for re-evaluations on October 27, 2021, and November 22, 2021, yet neither the initial examination report nor the re-evaluation reports made any prescription or recommendation for rental DME. Notwithstanding, Bingo submitted bills with undated prescriptions purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| G.P. | 10/19/2021-11/15/2021 | Ultrasound Therapy System | K1004 | $706.72 |
| | 10/19/2021; 11/2/2021 | Ultrasound System PS Patches | A9999 | $3,134.46 |
| | 10/19/2021-11/15/2021 | Cold Compression Device | E1399 | $1,954.40 |
| | 10/19/2021-11/15/2021 | Back Wrap | E1399 | $420.00 |

- On December 9, 2021, Covered Person C.H., claim no. 0651141137-03, was seen for an initial chiropractic examination at a No-fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, NY, and thereafter for a re-evaluation on February 23, 2022, yet, neither the initial examination report nor re-evaluation report made mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, Bingo submitted bills with prescriptions dated December 9, 2021 purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| C.H. | 1/5/2022-2/1/2022 | Ultrasound Therapy System | K1004 | $706.72 |
| | 1/5/2022; 1/19/2022 | Ultrasound System PS Patches | A9999 | $3,134.46 |
| | 1/5/2022-2/1/2022 | Cold Compression Device | E1399 | $1,954.40 |
| | 1/5/2022-2/1/2022 | Back Wrap | E1399 | $420.00 |

- On November 1, 2022, Covered Person M.C., claim no. 0689990728-03 was purportedly seen for an initial examination at a No-fault Clinic located at 62-69 99th Street, Rego Park, NY, and yet, the initial examination report,

made no mention of any prescription or recommendation for rental DME; rather, it contained illegible scribble for purported home exercise therapeutic equipment. Notwithstanding, Bingo submitted bills with prescriptions dated November 1, 2022, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| M.C. | 11/15/2022-12/12/2022 | Ultrasound Therapy System | K1004 | $706.72 |
| | 11/15/2022; 11/29/2022 | Ultrasound System PS Patches | A9999 | $3,134.46 |
| | 11/15/2022-12/12/2022 | Cold Compression Device | E1399 | $1,954.40 |
| | 11/15/2022-12/12/2022 | Back Wrap | E1399 | $420.00 |
| | 11/15/2022-12/12/2022 | L- Shoulder Wrap | E1399 | $420.00 |
| | 11/15/2022-12/12/2022 | R- Shoulder Wrap | E1399 | $420.00 |

114. Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

115. In furtherance of the scheme to defraud alleged herein, Bingo, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

116. As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment. Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other

services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

117.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or compression devices by the HCPs operating out of the No-fault Clinics, Cold Compression Devices and Portable Ultrasound units, billed for and purportedly dispensed by Bingo.

118.    In sum, Covered Persons purportedly receiving expensive Rental DME from Bingo Supplies, often receive more than ten (10) standard DME and/or orthotic devices and pain management rental DME, all prescribed by the same HCP, in some cases exceeding $10,000.00 in total costs for the items. By way of example but not limitation:

- In connection with claims submitted on behalf of Covered Person D.M., claim number 0655983476-01, Plaintiffs were billed for at least fourteen pieces of regular DME, totaling $12,158.80, all prescribed by the same HCP. On January 21, 2022, Rockville RX Inc (not named as a defendant in the Complaint) purportedly provided a bed board for $157.21, an LSO for $253.76, and a lumbar cushion for $282.40. Less than a week later, on January 26, 2022, Rockville RX Inc purportedly provided an orthopedic car seat for $196.50, a cervical collar for $233.00, and a foam rubber mattress for $155.52. On February 13, 2022, Complete Ortho Supply (not named a defendant in the Complaint) purportedly provided the second orthopedic car seat the Covered Person purportedly received, for $756.03. On March 8, 2022, Rapid Equipment Inc (not named a defendant in the Complaint) purportedly provided an EMS unit for $612.99, a TENS unit for $76.25, an infrared heating lamp for $156.00, a thermophore for $20.93, and a massager for $164.00.  On March 16, 2022, Get Well Supply Inc. (not named a defendant in the Complaint) purportedly provided a pulsed electromagnetic field therapy device for $4,500.00, along with accompanying pods for $1,275.00, and charged a delivery fee of $150.00 and an education fee of $150.00. On March 20, 2022, Rapid Equipment Inc purportedly provided a TLSO for $778.11. On March 28, 2022, Rapid Equipment Inc purportedly provided the second LSO that the Covered Person purportedly received, for $844.13. On April 6, 2022, Rapid Equipment Inc purportedly provided a left shoulder orthosis for $1,286.96, and a left knee orthosis for $607.55. On April 15, 2022, Rapid Equipment

Inc purportedly provided a cervical traction unit for $502.63. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting February 2, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Starting May 15, 2022, Austin Medical Supply Inc. (not named a defendant in the Complaint) purportedly provided a Pain Away Laser system for a forty-two-day rental, for the total amount of $2,814.00. Ultimately, Plaintiffs were billed for $22,028.38 in connection with at least nineteen pieces of DME all prescribed by a single HCP.

- In connection with claims submitted on behalf of Covered Person Y.M., claim number 0675788558-02, Plaintiffs were billed for at least fifteen pieces of regular DME, totaling $7,070.36, all prescribed by the same HCP. On September 4, 2022, Bridgeview Supply Corp (not named as a defendant in the Complaint) purportedly provided a cervical collar for $233.00, a foam rubber mattress for $155.52, a bed board for $157.21, and an LSO for $283.76. Less than a week later, on September 8, 2022, Bridgeview Supply Corp purportedly provided a lumbar cushion for $282.40, an orthopedic car seat for $196.50, and a cervical pillow for $22.04. On October 31, 2022, HN DNE Ortho Supply Inc (not named a defendant in the Complaint) purportedly provided an osteogenesis stimulator for $3,300.00. That same day, Red Medical Supply Inc (not named a defendant in the Complaint) purportedly provided an EMS unit for $612.99, a TENS unit for $76.25, an infrared heating lamp for $156.00, an electric heat pad for $20.93, and a massager for $164.00. On November 2, 2022, Red Medical Supply Inc. purportedly provided a cervical traction unit for $502.63. On November 4, 2022, Red Medical Supply Inc purportedly provided the second LSO to be purportedly provided to the Covered Person, for $844.13. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting September 19, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with two accompanying wraps for twenty-eight day rental periods for $840.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $6,635.58. Also starting September 19, 2022, Austin Medical Supply Inc. (not named a defendant in the Complaint) purportedly provided a Pain Away Laser system for a forty-two-day rental, for the total amount of $2,814.00. Ultimately, Plaintiffs were billed for $16,456.94 in connection with at least twenty pieces of DME all prescribed by a single HCP.

- In connection with claims submitted on behalf of Covered Person R.O.D., claim number 0689231504-03, Plaintiffs were billed for at least eleven

pieces of regular DME, totaling $3,964.36, all prescribed by the same HCP. On November 10, 2022, Welta Inc (not named as a defendant in the Complaint) purportedly provided a cervical collar for $75.00, a cervical pillow for $22.04, an LSO for $322.98, a bed board for $71.69, an eggcrate mattress for $155.52, and a lumbar cushion for $107.95. Over a month later, on December 19, 2022, Shaman Supplies Inc. (not named a defendant in the Complaint) purportedly provided an EMS/TENS unit for $370.00, an infrared heating lamp for $223.44, and a massager for $355.56. On January 24, 2023, Zastava Medical Supplies Inc. (not named a defendant in the Complaint) purportedly provided the second LSO purportedly provided to the Covered Person, for $1,150.00 and a cervical traction device for $502.63. On March 6, 2023, Pretoria Medical Supply Inc (not named a defendant in the Complaint) purportedly provided a knee orthosis for $607.55. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting January 24, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Ultimately, Plaintiffs were billed for $11,019.94 in connection with at least fifteen pieces of DME all prescribed by a single HCP.

- In connection with claims submitted on behalf of Covered Person J.G., claim number 0702910514-02, Plaintiffs were billed for at least thirteen pieces of regular DME, totaling $5,432.25, all prescribed by the same HCP. On April 3, 2023, Shaman Supplies Inc (not named as a defendant in the Complaint) purportedly provided a bed board for $101.85, a cervical collar for $233.00, a dry pressure mattress for $153.13, an LSO for $322.96, an orthopedic car seat for $260.00, a lumbar cushion for $282.40, an EMS/TENS unit for $370.00, an infrared heating lamp for $223.44, and a massager for $355.56. On April 28, 2023, Winston Supply Corp. (not named a defendant in the Complaint) purportedly provided the second LSO purportedly provided to the Covered Person, for $844.13, a cervical traction device for $502.63, a right shoulder orthosis for $896.92, and a TLSO for $886.23. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting January 24, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with two accompanying wraps for twenty-eight day rental periods for $840.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $6,635.58. Ultimately, Plaintiffs were billed for $12,067.83 in connection with at least seventeen pieces of DME all prescribed by a single HCP.

119.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

120.    On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, between the pain management Rental DME prescribed out of the No-Fault Clinics and the perioperative and/or postoperative rental DME and/or compression devices prescribed after the referral to an ASC, the Covered Persons receive at least four or more pieces of rental DME and/or compression devices, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the rental DME and/or compression devices prescribed for the Covered Person.  By way of example and not limitation, the following Covered Persons received the same or similar battery of rental DME and/or compression devices:

- In connection with claims submitted on behalf of Covered Person N.G., claim number 0497400747-01, Plaintiffs were billed for at least five pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies amounting to $13,109.90.  Starting November 4, 2021, the same day the Covered Person underwent an arthroscopic surgical procedure at an ASC, East Coast Med Group, Inc. (not named as a defendant in the Complaint) purportedly provided VenaFlow intermittent compression devices for both the left and right knees, for single day rentals for $272.65, each, and a Thermotek cold therapy system with shoulder wrap for a single day rental for $94.50, for the total amount of $639.80.  Starting two weeks later on November 19, 2021, Vital Care Group Inc. (not named as a defendant in the Complaint)

purportedly provided a shoulder continuous passive motion device ("CPM") for a forty-two-day rental period for $3,169.50 and a Game Ready Compression unit with wrap, for a twenty-eight-day rental period for $2,100.00, for a total of $5,269.50. Thereafter, starting December 6, 2021, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with two accompanying wraps for a twenty-eight day rental periods for $840.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $6,635.58.

- In connection with claims submitted on behalf of Covered Person N.P., claim number 0645505413-01, Plaintiffs were billed for at least six pieces of rental DME and/or compression devices and related appliances purportedly provided by four different companies, amounting to $13,610.59. Starting October 25, 2021, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with two accompanying wraps for a twenty-eight-day rental periods for $840.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $6,635.58. Thereafter, on January 19, 2022, the same day the Covered Person underwent an arthroscopic surgical procedure at an ASC, Good Medica Inc. (not named as a defendant in the Complaint) purportedly provided a VenaFlow Elite intermittent compressor and accompanying cuff, for a single-day rental at the ASC, for the total amount of $620.62. That same day, Exact Orthomed Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41. Starting three days later on January 22, 2022, Franklin Square Services, Inc. (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, for a forty-two-day rental period for the total amount of $4,202.10, with accompanying sheepskin pad for $19.50, and a water circulating system for a forty-two-day rental period for the total amount of $1,801.38.

- In connection with claims submitted on behalf of Covered Person D.F., claim number 0674753439-01, Plaintiffs were billed for at least eight pieces of rental DME and/or compression devices and related appliances purportedly provided by six different companies amounting to $18,889.11. Starting June 18, 2022, Austin Medical Supply Inc. (not named a defendant in the Complaint) purportedly provided a Pain Away Laser system for a forty-two-day rental, for the total amount of $2,814.00. Thereafter, starting August 8, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight-day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental

period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. On December 17, 2022, the day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Medex Supplies Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41. Starting one week later, on December 21, 2022, NYC Great Supply Inc (not named a defendant in the Complaint) purportedly provided a cold compression device for a fifty-six-day rental period, along with accompanying shoulder wrap, for the total amount of $3,829.00. Also starting on December 21, 2022, A1 Med Supply Inc (not named as a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, for a fifty-six-day rental period, along with accompanying sheepskin pad, and delivery-setup charge, for the total amount of $1,916.14. Starting February 23, 2023, just over a week after NYC Great Supply's compression device and A 1 Med Supply Inc's continuous passive motion device rentals concluded, NextStep Healing, Inc. (not named a defendant in the Complaint) purportedly provided a Game Ready cold compression unit with accompanying wrap for an additional nineteen-day rental period, for $1,615.00, and a continuous passive motion device for the shoulder, for an additional forty-two day rental period for $1,309.98.

121.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

### 1. **Fraudulent billing for Cold Compression Devices**

122.    In furtherance of the scheme to defraud alleged herein, Gulkarov, through Bingo, routinely submitted bills to Plaintiffs for Squid Cold Compression Systems ("Cold Compression Devices") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

123.    Each of the Covered Persons that receive Cold Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0643969793-02, 0642285563-01, 0642972848-01, 0643918576-02, 0645505413-01, 0650155252-02,   0650522212-01,   0651141137-03,   0653705822-01,   0655983476-01, 0674753439-01, 0679176735-02, 0689231504-03, and 0694750894-01, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

124.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.  As part of the aforementioned treatment protocol, contemporaneous with or a short time after Covered Persons are prescribed basic DME, Covered Persons are also prescribed the Cold Compression Devices on a rental basis for the purposes of pain management that Defendants purportedly provided to Covered Persons.   Indeed, in addition to receiving a substantial and similar battery of regular and rental pain management DME, including a Cold Compression Device purportedly provided by Bingo, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescriptions, the Covered Persons receive one or more additional compression devices and other rental DME the same day as or shortly following undergoing medically unnecessary arthroscopic surgeries at ASCs.  By way of example and not limitation below are non-exhaustive examples of the extreme volume of regular and rental DME provided to patients pursuant to a fraudulent treatment protocol for which the DME Retailers paid kickbacks and/or other financial compensation for the referral from the No-fault Clinics:

- In connection with claims submitted on behalf of Covered Person R.L., claim number 0642972848-01, Plaintiffs were billed for at least 20 pieces of regular DME, totaling $10,438.09.  On September 30, 2021, Dakiroks Products Corp (not named as a defendant in the Complaint) purportedly provided a foam rubber mattress for $155.52, an infrared heat lamp for $385.47, a massager for $355.56, an EMS unit for $482.28, an EMS belt for $40.90, a lumbar cushion for $491.77, a cervical pillow for $22.04, a bed board for $101.85, a cervical collar for $311.75, and an LSO for $708.65. Three weeks later, on October 20, 2021, Dakiroks Products Corp purportedly provided a knee orthosis for $1,107.70 and a cervical traction unit for $502.63. Three weeks after that, on November 11, 2021, Dakiroks Products Corp also purportedly provided an elbow orthosis for $1,090.98, a wrist support for $982.19, and two shoulder orthoses for $896.92, each.  In the interim, on October 25, 2021, Healing Supply Inc (not named as a defendant in the Complaint) purportedly provided the second knee orthosis the Covered Person purportedly received, for $536.08. On November 4, 2021, AAA Medical DME Inc (not named as a defendant in the Complaint) purportedly provided custom fitted shoe inserts for both feet, for $262.44, each. On November 29, 2021, VVO Supply Inc (not named as a defendant in the Complaint) purportedly provided the second LSO the Covered Person purportedly received, for $844.00. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting October 7, 2021, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Thereafter, Plaintiffs were billed for at least six pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $4,743.28 in total charges.  Specifically, starting January 22, 2022, the same day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Exact Orthomed Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41.  That same day, Floral Med Supply Inc (not named a defendant in the Complaint) purportedly provided a pneumatic compressor with accompanying appliance, for a single-day rental at the ASC, for the total amount of $620.62.  Also that same day, Manor Med Supplies (not named a defendant in the Complaint) purportedly provided a full body blanket for a single day rental at an ASC, for $19.75, and a 3M Bair Hugger, for a single day rental at an ASC for $223.00. Starting two days later on January 24, 2022, NYC Great Med Supply Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device, rented for a twenty-eight-day period for the total amount of $1,792.00, and accompanying shoulder wrap for

$245.00. Also starting January 24, 2022, A1 Med Supply Inc (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder for a fourteen-day rental period for the total amount of $1,470.00, with accompanying pad for $23.50. Ultimately, Plaintiffs were billed for $22,236.95 in connection with at least twenty-eight pieces of DME.

- In connection with claims submitted on behalf of Covered Person R.W., claim number 0650155252-02, Plaintiffs were billed for at least thirteen pieces of regular DME, totaling $7,078.80. On November 11, 2021, Titan Equipment (not named as a defendant in the Complaint) purportedly provided a lumbar cushion for $E2611, an LSO for $283.76, a bed board for $157.21, a foam mattress for $155.52, a cervical collar for $233.00, and a cervical pillow for $22.04. On December 27, 2021, APA Supply Inc (not named as a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63. Three weeks later, on January 17, 2022, APA Supply Inc purportedly provided both right and left shoulder braces for $499.12, each. On February 16, 2022, AVA Supply Inc (not named as a defendant in the Complaint) purportedly provided the second LSO the Covered Person purportedly received, for $844.00, and both right and left hip braces for $750.00, each. On March 5, 2022, Get Well Supply Inc (not named as a defendant in the Complaint) purportedly provided a Triad 3LT Low Level Light Therapy device for $2,100.00. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting December 16, 2021, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with accompanying wrap for a twenty-eight day rental period for $450.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $5,862.22. Thereafter, Plaintiffs were billed for at least ten pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by four different companies, amounting to $13,042.52 in total charges. Specifically, on March 9, 2022, the same day the Covered Person underwent an arthroscopic surgical procedure at an ASC, Good Medica Inc. (not named as a defendant in the Complaint) purportedly provided a VenaFlow Elite intermittent compressor and accompanying cuff, for a single-day rental at the ASC, for the total amount of $620.62. That same day, Exact Orthomed Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41. Starting just over a week later on March 17, 2022, Franklin Square Services, Inc. (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, for a for a forty-two-day rental period for the total amount of $4,202.10, with accompanying sheepskin pad for $19.50, and a water circulating system for a forty-two-day rental period for the total amount of $1,801.38. Thereafter,

on July 6, 2022, the same day the Covered Person underwent a second arthroscopic surgical procedure at an ASC, Good Medica Inc. purportedly provided a VenaFlow Elite intermittent compressor, and accompanying cuff, for a single-day rental at the ASC, for the total amount of $620.62. That same day, Exact Orthomed Inc purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41. Starting five days later on July 11, 2022, IMD Supply Group Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device, rented for a fifty-six- day period for the total amount of $3,640.00, and accompanying shoulder wrap for $110.00, and a continuous passive motion device for the shoulder, rented for a forty-two-day period for $1,309.98, along with synthetic sheepskin pad for $19.50. Ultimately, Plaintiffs were billed for $25,983.54 in connection with at least twenty-seven pieces of DME.

- In connection with claims submitted on behalf of Covered Person P.S., claim number 0650522212-01, Plaintiffs were billed for at least nineteen pieces of regular DME, totaling $9,201.92. On December 15, 2021, APA Supply Inc (not named as a defendant in the Complaint) purportedly provided a lumbar cushion for $282.40, a bed board for $101.85, a cervical pillow for $22.04, a cervical collar for $75.00, a foam mattress for $155.52, an infrared heat lamp for $210.12, a massager for $355.56, an EMS unit for $350.00, an EMS Belt for $18, and an LSO for $322.98. On February 14, 2022, AVA Supply Inc (not named as a defendant in the Complaint) purportedly provided a second LSO the Covered Person purportedly received, for $844.00, and a cervical traction unit for $502.63. A week later, on February 21, 2022, AVA Supply Inc purportedly provided left and right shoulder orthoses, for $499.12 each. A week later, on February 28, 2022, AVA Supply Inc purportedly provided a right knee orthosis for $607.55. On March 1, 2022, Complete Ortho Supply (not named as a defendant in the Complaint) purportedly provided an orthopedic car seat for $756.03. On March 6, 2022, Get Well Supply Inc (not named as a defendant in the Complaint) purportedly provided a Triad 3LT Low Level Light Therapy device for $2,100.00. On March 24, 2022, AVA Supply Inc purportedly provided right and left hip orthoses, for $750.00, each. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting January 24, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Thereafter, Plaintiffs were billed for at least six pieces of postoperative rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $5,752.96 in total charges. Specifically, starting October 6, 2022, a week following when the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Med

ALJ Inc. (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, for a for a forty-two-day rental period for the total amount of $1,309.98, with accompanying sheepskin pad for $19.50 and deliver/setup fee of $150.00. That same day, Excel DME Inc. (not named a defendant in the Complaint) purportedly provided a cold compression device for a twenty-one-day rental period for the total amount of $1,197.00, along with accompanying wrap for $110.00 and gel pack for $90.00. Thereafter, starting January 2, 2023, the three days following a second arthroscopic surgical procedure at an ASC purportedly underwent by the Covered Person, Med ALJ Inc. (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, for a for a forty-two-day rental period for the total amount of $1,309.98, with accompanying sheepskin pad for $19.50 and deliver/setup fee of $150.00. That same day, Excel DME Inc. (not named a defendant in the Complaint) purportedly provided a cold compression device for a twenty-one-day rental period for the total amount of $1,197.00, along with accompanying wrap for $110.00 and gel pack for $90.00. Ultimately, Plaintiffs were billed for $22,010.46 in connection with at least thirty-one pieces of DME.

125. A Compression Device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. A Cold Compression Device, which was also billed for by Defendants, operates similarly but simultaneously applies cold therapy to the affected area of the patient.

126. A compression device is used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

127. The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

128. However, the Cold Compression Devices purportedly dispensed by Bingo were not dispensed following a surgery to prevent a DVT, but were purportedly provided for pain

management and/or to reduce swelling and inflammation related to soft-tissue injuries caused by a motor vehicle accident.

129.     On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident when the patient is able to use an ice pack and compression bandage to address swelling and inflammation.

130.     On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident for use more than a week following the accident, long after the period when cold therapy and compression, would decrease swelling from the trauma caused by a low-impact automobile accident.

131.     Notwithstanding the foregoing, the Cold Compression Devices that Bingo purportedly provided to Covered Persons were prescribed by HCPs for use by Covered Persons a week or more following the date of their low-impact automobile accidents, and on information and belief, to patients who were able to use ice packs and compression bandages to address swelling and inflammation.

132.     The Cold Compression Devices supplied by Bingo were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

133.     In that regard, Bingo routinely billed Plaintiffs for Cold Compression Devices and accompanying compression wraps under code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement Amount.

44

134.    The maximum monthly rental rate that Bingo may charge for Cold Compression Devices and accompanying compression wraps billed under code E1399 is ten percent (10%) of Bingo's acquisition costs and maximum accumulated rental reimbursement that Bingo may receive is the maximum reimbursement Bingo may receive for the Cold Compression Devices under the Fee Schedule, the lesser of fifty percent (50%) above Bingo's acquisition cost or the usual and customary price charged to the public.

135.    Bingo's acquisition costs for Cold Compression Devices and accompanying compression wraps, and resulting maximum monthly rental rates and total accumulated reimbursement amounts are as follows:

| Item | Acquisition Cost | Max Monthly Rental Rate | Max Accumulated Reimbursement Amt. |
|---|---|---|---|
| Back Compression System | $850.00 | $85.00 | $1275.00 |
| Leg (Knee) Compression System | $790.00 | $79.00 | $1,185.00 |
| Ankle Compression System | $790.00 | $79.00 | $1,185.00 |
| Shoulder Compression System | $750.00 | $75.00 | $1,125.00 |
| Wrist Compression System | $750.00 | $75.00 | $1,125.00 |
| Back Wrap & Gel Pack | $300.00 | $30.00 | $450.00 |
| Leg (Knee) Wrap & Gel Pack (Large) | $285.00 | $28.50 | $427.500 |
| Ankle Wrap & Gel Pack (Large) | $285.00 | $28.50 | $427.500 |
| Shoulder Wrap & Gel Pack (Large) | $275.00 | $27.50 | $412.50 |
| Wrist Wrap & Gel Pack | $190.00 | $19.00 | $285.00 |

136.    Moreover, each Compression System purchased by Bingo from its wholesaler consists of a Cold Compression Device and corresponding wrap and gel pack. Each purchase of a wrap and gel pack is for additional accessories to be rented out to Covered Persons as the second and/or third wrap provided to Covered Persons.

137.    Bingo Supplies routinely billed for Cold Compression Devices under code E1399, for $1,954.40 for a twenty-eight-day rental, and under code E1399 for each compression wrap for $420.00 for a twenty-eight-day rental, far exceeding both the maximum permissible monthly rental rate and maximum accumulated rental reimbursement under the No-fault Law.

138.     By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims where Bingo submitted fraudulent bills to Plaintiffs for Cold Compression Devices billed under code E1399 at a daily rental date of $69.80 for totals upwards of $1,954.40 for a 28 day rental, broken up into eight to ten day increments, and accompanying appliances under codes E1399 at a daily rental rate of $15.00, for upwards of $420.00 per 28 day rental per appliance, broken up into eight to ten day increments, at times for up to $1,260.00 for the rental of three appliances.

**2.        Fraudulent billing of Portable Ultrasound Units**

139.     In furtherance of the scheme to defraud alleged herein, Gulkarov, through Bingo, routinely submitted bills to Plaintiffs for Portable Ultrasound units that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

140.     The Portable Ultrasound unit is a battery powered, wearable and portable device that purports to produce ultrasound in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period.

141.     Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Portable Ultrasound units for patients that, in many instances, were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, along with a host of other expensive DME, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, contemporaneous with the dispensing of the Portable Ultrasound units, Covered Persons received a substantial and similar battery of regular DME and often pain management

rental DME, pursuant to a fraudulent protocol established at the No-fault Clinics where the Covered Persons presented for treatment.

142.    Moreover, similar to the compression devices described above, the Portable Ultrasound units were provided contemporaneously with standard DME and often prior to the provision of additional perioperative and/or postoperative rental DME and/or compression devices the same day as or shortly following undergoing medically unnecessary arthroscopic surgeries at ASCs, pursuant to a fraudulent protocol of treatment established by the No Fault Clinics that issue the fraudulent prescriptions.  By way of example and not limitation:

- In connection with claims submitted on behalf of Covered Person M.M., claim number 0659102981-02, Plaintiffs were billed for at least seventeen pieces of regular DME, totaling $8,941.09. On March 17, 2022, Rapid Equipment Inc (not named as a defendant in the Complaint) purportedly provided a lumbar cushion for $282.40, an LSO for $322.96 and an orthopedic car seat for $196.50. Eleven days later, on March 28, 2022, Rapid Equipment Inc. purportedly provided a bed board for $157.21, a foam mattress for $155.52, a cervical collar for $233.00, and a cervical pillow for $22.04. Just over three weeks after that, on April 22, 2022, Rapid Equipment Inc. also purportedly provided an infrared heating lamp for $156.00, a massager for $164.00, and a TENS unit for $76.25.  Just four days later on April 26, 2022, Rapid Equipment Inc purportedly provided an EMS unit for $612.99 and a thermophore for $20.93. Over a month later, on June 7, 2022, Bridgeview Supply Corp. (not named as a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63. Ten days later, on June 17, 2022, Bridgeview Supply Corp purportedly provided a right shoulder orthosis for $1,286.96. Four days later, on June 21, 2022, Rapid Equipment Inc purportedly provided a knee orthosis for $607.55. Just over two weeks later, on July 7, 2022, Rapid Equipment Inc purportedly provided the second LSO purportedly provided to the Covered Person, for $844.00. A month later, on August 5, 2022, Rambam Ortho Supply Inc (not named a defendant in the Complaint) purportedly provided an osteogenesis stimulator for $3,300.00. Starting March 10, 2023, a week before the Covered Person purportedly received any regular DME, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Starting June 18, 2023, Austin Medical Supply Inc. (not named a defendant

in the Complaint, purportedly provided a Pain Away Laser unit, another pain management rental device, for a forty-two-day rental period for $2,814.00. Thereafter, Plaintiffs were billed for at least three pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $6,094.55 in total charges. Specifically, starting December 17, 2022, the same day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Medex Supplies Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41.Starting two days later on January 24, 2022, NYC Great Med Supply Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device, rented for a fifty-six-day period for the total amount of $3,584.00, and accompanying shoulder wrap for $245.00. Also starting January 24, 2022, A1 Med Supply Inc (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder for a fifty-six-day rental period for the total amount of $1,746.64, with accompanying pad for $19.50 and delivery/setup charge of $150.00. Ultimately, Plaintiffs were billed for $24,905.22 in connection with at least twenty-five pieces of DME.

- In connection with claims submitted on behalf of Covered Person M.C., claim number 0689990728-03, Plaintiffs were billed for at least fourteen pieces of regular DME, totaling $6,849.06. On November 10, 2022, Red Medical Supply Inc (not named as a defendant in the Complaint) purportedly provided a lumbar cushion for $282.40, a foam mattress for $155.52, a cervical collar for $233.00, a cervical pillow for $22.04, and a bed board for $157.21. Three days later, on November 13, 2022, Red Medical Supply Inc purportedly provided an LSO for $322.96. On December 7, 2022, HM DME Ortho Supply Inc (not named a defendant in the Complaint) purportedly provided an osteogenesis stimulator for $3,300.00. On December 15, 2022, Tov Medical Supply Inc (not named as a defendant in the Complaint) purportedly provided a massager for $164.00, a TENS/EMS unit for $$612.99, an infrared heat lamp for $156.00, a TENS unit for $76.25, and an electric heat pad for $20.93. on January 13, 2023, Tov Medical Supply Inc purportedly provided a cervical traction unit for $502.63, and the second LSO purportedly provided to the Covered Person for $844.14. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting November 15, 2022, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Starting November 30, 2023, Prime Tech Ortho Inc (not named a defendant in the Complaint, purportedly provided a Pain Away Laser unit, another pain management rental device, for a forty-two-day

rental period for $2,814.00. Starting April 5, 2023, MiiSupply Inc (not named a defendant in the Complaint) purportedly provided a compression device for a twenty-eight-day rental period for $1,897.56. Thereafter, on May 18, 2023, the same day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Medex Supplies Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41. Ultimately, Plaintiffs were billed for $18,965.61 in connection with at least twenty pieces of DME.

- In connection with claims submitted on behalf of Covered Person D.B.W., claim number 0694750894-01, Plaintiffs were billed for at least thirteen pieces of regular DME, totaling $6,294.09. On January 11, 2023, Zastava Medical Supplies Inc (not named as a defendant in the Complaint) purportedly provided a cervical collar for $233.00, a bed board for $101.85, a dry pressure mattress for $153.13, a lumbar cushion for $282.40, an LSO for $759.92, a massager for $295.00, an EMS belt for $83.79, and a TENS unit for $76.25. On January 14, 2023, Lang Equipment (not named a defendant in the Complaint) purportedly provided a shoulder orthosis for $1,286.96. On January 24, 2023, Zastava Medical Supplies Inc purportedly provided for a shoulder orthosis $896.92. On February 24, 2023, Shaman Supplies Inc (not named a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63, and the second LSO purportedly provided to the Covered Person, for $844.13. On March 30, 2023, Gorsk Medical Supplies Inc (not named as a defendant in the Complaint) purportedly provided a TLSO for $778.11. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting January 24, 2023, Defendant Bingo purportedly provided a Compression Device, for a twenty-eight-day rental period, for $1,954.40, with three accompanying wraps for twenty-eight day rental periods for $1,260.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of $7,055.58. Thereafter, Plaintiffs were billed for at least three pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $2,288.23 in total charges. Specifically, starting February 17, 2023, the same day the Covered Person purportedly underwent an arthroscopic surgical procedure at an ASC, Highland Ave Care Inc (not named a defendant in the Complaint) purportedly provided a cold compression unit with accompanying cold therapy wrap, for a single day rental at the ASC, for the total amount of $349.41.Starting four days later on January 24, 2022, A1 Med Supply Inc (not named as a defendant in the Complaint) purportedly provided a continuous passive motion device for the shoulder, rented for two fourteen-day periods for the total amount of $873.32, with accompanying pad for $19.50 and delivery/setup charge of $150.00. Starting April 5, 2023, NYC Great Supply Inc (not named a defendant in the Complaint) purportedly

49

provided a cold compression device for a fourteen-day rental period for $896.00. Ultimately, Plaintiffs were billed for $15,637.90 in connection with at least twenty pieces of DME.

143.     The heating pattern of the Portable Ultrasound unit is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP.  For example, the ultrasound purportedly provided by the Portable Ultrasound unit only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

144.     In keeping with the facts that the Portable Ultrasound units purportedly provided by Bingo were medically unnecessary, Covered Persons purportedly receiving the devices were, at the same time, undergoing a protocol of physical therapy treatment at the No-fault Clinics, obviating the need for at-home ultrasound therapy.

145.     The Portable Ultrasound units are routinely prescribed along with Cold Compression Devices by the same HCPs at the No-fault Clinics that are also prescribing upwards of ten or more pieces of regular DME.  Covered Persons receiving Portable Ultrasound units are often referred for medically unnecessary arthroscopic surgical procedures for which Covered Persons are often referred additional rental DME devices including one or more additional compression devices, continuous passive motion devices and/or cryotherapy units.

146.     The prescriptions for the Portable Ultrasound units are never given to the patients. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

147.     In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the Portable Ultrasound units in particular.

148.    Upon receipt of the prescriptions for the Portable Ultrasound units, Bingo routinely submits bills to insurers for rental periods of four (4) weeks regardless of actual patient need in order to maximize reimbursement.

149.    Moreover, Bingo Supplies routinely separated each four-week rental into two bills, each for two weeks of the full rental period, to conceal from insurers the true length and total accumulated rental cost of the billed for Portable Ultrasound units.

150.    On information and belief, oftentimes, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device.  Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the patients.  In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

151.    The Portable Ultrasound unit dispensed by Defendants to the Covered Persons delivers ultrasounds through a single replaceable PS patch at a time.

152.    On each bill for fourteen days of a twenty-eight-day rental period, Bingo Supplies billed Plaintiffs for twenty-one PS patches, more than one for each day's treatment.

153.    Moreover, on information and belief, the PS patches for the Portable Ultrasound unit purportedly dispensed to Plaintiffs are reusable for up to thirty treatments.

154.    Accordingly, Defendants routinely inflated the reimbursements they sought on each bill submitted to Plaintiffs for Portable Ultrasound units by billing for an excessive quantity of PS patches, beyond what would have been medically necessary, to the extent the Portable Ultrasound units are medically necessary at all.

155.    By way of example and not limitation, Gulkarov, through Bingo, routinely submitted bills to Plaintiffs for Portable Ultrasound units under code K1004 in amounts up to and

51

including $706.72, and accompanying PS patches under code A9999, in amounts up to and including $3,134.46, which were not provided as billed, if any were provided at all, and were supplied pursuant to a fraudulent protocol of treatment. Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims submitted through Bingo to Plaintiffs where Retailer Defendant submitted fraudulent bills for Portable Ultrasound units under code K1004 at a daily rental rate of $25.24, in amounts ranging from $353.36 to $706.72 per bill, and accompanying PS patches billed under code A9999 at a unit price of $74.63, in amounts ranging from $1,044.82 to $3,134.46 per bill.

156. Finally, to the extent the Portable Ultrasound devices purportedly provided to Covered Persons on a rental basis, and accompanying PS patches are reimbursable at all, Gulkarov, through Bingo billed Plaintiffs far in excess of that permissible under the Fee Schedule.

## DISCOVERY OF THE FRAUD

157. To induce Plaintiffs to promptly reimburse their claims for Rental DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- Gulkarov, through Bingo, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Gulkarov, through Bingo, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Gulkarov, through Bingo, knowingly misrepresented and concealed that Bingo's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Gulkarov, through Bingo, knowingly and deliberately concealed the amounts Bingo was entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

158.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $86,000.00 based upon the fraudulent bill submissions.

159.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT GULKAROV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

160.    The allegations of paragraphs 1 through 159 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

161.    At all times relevant herein, Bingo Supplies Inc. was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

162.     From, in or about August 6, 2021, through the date of the filing of this Complaint, Defendants Gulkarov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Bingo enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

163.     At all relevant times mentioned herein, Defendant Gulkarov, together with others unknown to Plaintiff, exerted control over and directed the operations of the Bingo enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

164.     One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Gulkarov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims.

165.     It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and

the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

<div align="center">

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

</div>

166.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Gulkarov, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

167.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Bingo continues to pursue collection on the fraudulent billing to the present day.

168.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Gulkarov, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Bingo enterprise based upon materially false and misleading information.

169.    Through the Bingo enterprise, Defendant Gulkarov submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Gulkarov, as well as the payments that Plaintiffs made in response

to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Gulkarov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Bingo enterprise through the filing of this Complaint.

170.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Gulkarov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

171.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

172.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

173.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $82,000.00, the exact amount to be determined at trial.

174.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Defendants Gulkarov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS BINGO, AND GULKAROV**

**(Common Law Fraud)**

175.     The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

176.     Defendants Bingo and Gulkarov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

177.     Each and every bill and supporting documentation submitted by Defendants Bingo and Gulkarov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

178.     Defendants Bingo and Gulkarov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Bingo was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined

by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; and/or (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Gulkarov, through Bingo, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Gulkarov, through Bingo, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

179.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Bingo's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

180.    Defendants Bingo and Gulkarov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

181.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Bingo and Gulkarov.

182.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendants Bingo's claims for No-fault insurance benefits submitted in connection therewith.

183.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Bingo and Gulkarov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

184.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $86,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS BINGO AND GULKAROV

### (Unjust Enrichment)

185.    The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

186.    By reason of their wrongdoing, Defendants Bingo and Gulkarov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

187.    Plaintiffs are therefore entitled to restitution from Defendants Bingo and Gulkarov in the amount by which it has been unjustly enriched.

188.    By reason of the foregoing, Plaintiffs and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $86,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

### FOURTH CLAIM FOR RELIEF

### AGAINST THE RETAIL DEFENANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

189.    The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

190.     At all relevant times mentioned herein, each and every bill mailed by Gulkarov, through Bingo, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME and/or orthotic devices.

191.    To the extent the Rental DME and/or orthotic devices were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

192.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

193.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

194.    As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

195.    Plaintiffs have no adequate remedy at law.

196.    The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $86,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
       March 12, 2024

                              Morrison Mahoney LLP


                              By:   /s/ Lee Pinzow
                                   Robert A. Stern, Esq.
                                   James McKenney, Esq.
                                   Lee Pinzow, Esq.
                                   Attorneys for Plaintiffs
                                   Wall Street Plaza
                                   88 Pine Street, Suite 1900
                                   New York, New York 10005
                                   (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,** <br><br> **Plaintiffs,** <br><br> -against- <br><br><br> **BINGO SUPPLIES INC., ELEOR GULKAROV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,** <br><br> **Defendants.** | **CIVIL ACTION** <br><br> **24-CV-1825** <br><br> **COMPLAINT** <br><br> **(TRIAL BY JURY DEMANDED)** |

# COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFFS**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**